CHARLES BOOTH AND OTHERS *vs.* THE TOWN OF WOODBURY.

Towns, like other corporations, have no powers except such as are expressly or impliedly granted to them by the legislative power of the state.

In the absence of authority so conferred, a town has no power to appropriate money for gratuities to men drafted for the military service of the United States.

But the legislature has power to authorize a town to confirm such action by another vote on the subject, and such confirmatory action of the town will be valid.

The power of the legislature is limited only by the constitutions of the state and of the United States and by the principles of natural justice.

The provision of the constitution of the state against taking private property for public use without compensation, has no application to the taking of property by taxation. The latter takes money from individuals as their share of a justly imposed and apportioned public burden, and an equivalent is presumptively received in the benefits conferred by the government; the former takes property from an individual as something distinct from and more than his share of the general burden, and therefore the justice and necessity of special compensation.

It is not contrary to natural justice that all the inhabitants of the state should be taxed for gratuities to a part of their number who are called upon to render military service to the general government.

So far from this there is an obvious equity in the burden being shared by all.

Every citizen is bound to take up arms in defence of his government if necessary, and the selection of a class only, of a certain age, is arbitrary, and based solely upon considerations of expediency.

Although the state as such is under no obligation to aid the general government in raising an army for national defense, yet the general good of the people of the state is involved in the maintenance of the general government, and the legislature may properly act for the promotion of this general good.

If the legislature could not tax the people for a gratuity where no possible public

benefit would be produced, the case must yet be one of an extraordinary character to justify the interference of the judiciary.

If there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy and not of natural justice, and the determination of the legislature is conclusive.

PETITION for an injunction.

The petition alleged that the legal voters of the town of Woodbury held a special town meeting, in pursuance of a call by the selectmen for the same, on the 13th day of August, 1863, at which the following votes were passed.

"Whereas, under the law of Congress passed March 3d, 1863, known as the Conscription Law, and under the call of the President of the United States, the apportionment thereunder of the town of Woodbury is supposed to be thirty-two men, to be drafted from among the citizens of this town liable to do military duty :—

"*Therefore, Resolved,* That the sum of six thousand four hundred dollars, or so much of said sum as may be necessary, be and the same is hereby appropriated from the treasury of this town for the following purposes, viz., two hundred dollars thereof to be paid into the hands of a committee to be appointed for that purpose, for the benefit of each person drafted from this town who shall not be exempt under any of the provisions of said law, and who shall be liable to answer to the said draft under any of the provisions of said law ; said committee to procure substitutes for each and all such drafted men whenever each one so drafted shall furnish to said committee the amount in cash over and above the two hundred dollars necessary to procure a substitute, not exceeding three hundred dollars in the whole :—Provided, if substitutes can not be had by said committee for a sum not exceeding three hundred dollars each, then in that case said committee pay over said two hundred dollars furnished by the town to each of such drafted men that is mustered into the service of the United States himself, and also to any one who does not refuse to accept a substitute when to be had for a sum not exceeding three hundred dollars.

"*Resolved,* That the selectmen of the town be and they are

hereby authorized to borrow the said sum of six thousand four hundred dollars, or such part thereof as shall from time to time be necessary, and make their orders on the town therefor; and the selectmen are hereby appointed to disburse such money or such part thereof to said committee as shall be necessary to carry out the foregoing resolution."

Other votes passed, including one appointing the committee, are omitted.

The petitioners averred that said votes were illegal, unjust to the tax-payers, unconstitutional, and disloyal to the government of the United States; that they were intended to defeat the proper effect of the law of the United States, and the call of the President for three hundred thousand drafted men to fill the armies of the United States; and that the town thereby unlawfully undertook to transfer the individual liability of each person drafted by the United States, to widows, orphans and non-military subjects, as well as to those liable in their own persons to do military duty in behalf of the United States. They also averred that they were inhabitants and tax-payers of the town and had a direct interest in said votes, and that their property was liable to be taken for the tax made necessary thereby, and that the selectmen of the town, the committee appointed and the treasurer of the town were endeavoring to raise said sum of six thousand four hundred dollars, and threatened to raise it if possible, and to issue town notes, orders, or other evidences of indebtedness against the town to secure the same, to be paid ultimately by tax out of the property of the tax-payers of the town. They therefore prayed for an injunction against the town and the officers named, forbidding them to borrow or otherwise raise said money or any part of it, or to pay it out or any part of it in the manner directed by the vote of the town.

The respondents made the following answer:—"That in pursuance of a statute passed at the special session of the legislature in November, 1863,* said town of Woodbury, at a legal

---

* The statute here referred to is given in full in the report of the case of *Baldwin* v. *Town of North Branford*, ante, page 49.

meeting duly called and held on the 18th day of January, 1864, passed the following vote, to wit:—' Voted to confirm the votes and resolutions passed at a special town meeting on the 13th day of August, 1863, and recorded on the records of this town in the town clerk's office.' The respondents therefore pray that the petitioners take nothing by their motion and that the same be dismissed."

The petitioners demurred to the answer, and the case was reserved for the advice of this court.

*Cothren*, for the petitioners.

1. Towns have no inherent power or right to tax their inhabitants to sustain either the state or national government. They have only the rights conferred by their charters. *Willard* v. *Borough of Killingworth*, 8 Conn., 254; *Higley* v. *Bunce*, 10 id., 442; *City of New London* v. *Brainard*, 22 id., 552; *Abendroth* v. *Town of Greenwich*, 29 id., 356, 362; *Stetson* v. *Kempton*, 13 Mass., 272, 278, 282; *Hodges* v. *City of Buffalo*, 2 Denio, 110. It is the duty of the national government to protect and defend not only the towns from the casualties of war but also the several states. It is not the duty of the towns to defend either the state or the nation. Even a state has no power to tax its inhabitants to defend itself or the nation. The constitution vests the whole power of declaring and carrying on war, either offensive or defensive, in the general government. The United States calls under the war power for a contribution from the able bodied men within certain ages to fill its armies and pays the persons who serve. It is wholly a national matter.

2. The liability to military service in defense of the country is wholly a personal liability, and a duty owed by such as are military subjects of the United States. This liability can not be transferred to any other person or persons; especially it can not be transferred by taxation or otherwise to widows, orphans, children, and non-military subjects.

3. The legislature, either before or after such town action, has no power to authorize the towns to pass votes taxing citizens to pay for the individual liability of citizens owing service

to the United States. *Woodruff* v. *Neal*, 28 Conn., 165, 169; *Goshen* v. *Stonington*, 4 id., 225.; *Matter of Albany Street*, 11 Wend., 148, 151; *Matter of John Street*, 19 id., 676; *Dash* v. *Van Kleeck*, 7 Johns., 504; *Taylor* v. *Porter*, 4 Hill, 140, 144; *Opinion of Judges of Supreme Court of Maine*, Am. Law Reg., Aug. 1863, p. 621; *Killam* v. *Killam*, Am. Law Reg., Nov. 1861, p. 18. The legislature has no power to take private property for private use. It does not even have the power to take private property for public use without just compensation. But the new act allows towns to take by taxation private property to pay private liabilities imposed by the United States, without any compensation. Suppose the town should pass a vote dividing the property of the inhabitants equally among all the citizens of the town. Such a vote would of course be illegal and wholly void. Could the legislature authorize towns to make such action legal by a subsequent vote ratifying the former one? Such action of the legislature, whether by giving power to towns in the first instance, or by confirming their void acts after they are past, is itself utterly void, because beyond the constitutional power of the legislature, and contrary to the general principles of legislation.

*E. W. Seymour* and *Huntington*, for the respondents.

1. The votes of the town were legal at the time they were passed and before they were confirmed under the statute passed in November, 1863, " authorizing towns to hold town meetings for purposes therein specified." By our statutes it is made the duty of towns to make such " orders, rules and regulations for their welfare as they may deem expedient," and to grant annual taxes " sufficient to defray all lawful and necessary expenses incurred by them. Rev. Stat., tit. 3, §§ 29, 31. It was for the common benefit of the inhabitants of Woodbury that the town quota should be filled, and that common benefit justifies a general taxation. The common welfare of the town might demand that substitutes should be hired for drafted men, who would serve the government equally well, and leave good farmers and good mechanics at their

labor. The town could better afford to pay the money than lose the men, and the government is in either case equally assisted. The same argument holds good in reference to the three hundred dollar commutation fee. But the right of towns in Connecticut to appropriate money from their treasuries, and lay taxes to pay bounties in furtherance of the necessities of the general government in time of war, is not urged now for the first time. It was a right constantly exercised up to the establishment of our state constitution. 1 Hollister's Hist. of Conn., 88 ; 2 id., 147 ; Cothren's Hist. of Woodbury, 188 ; 2 Kent Com., (4th ed.,) 274 ; 1 De Tocqueville's Democracy in America, 40. It is a right judicially recognized. *Hitchcock* v. *Litchfield,* 1 Root, 206. The constitution of this state is a limitation of powers. *Starr* v. *Pease,* 8 Conn., 547. It has never limited the power of towns in this particular. By the terms of the constitution itself, all rights that corporations had previous to its establishment, are expressly guaranteed, save as expressly restricted by that instrument. Constitution, art. 10, sec. 3. The case of *New London* v. *Brainard,* 22 Conn., 552, differs in all the above particulars from the case at bar.

2. If there was no power in the town to pass the vote in question, the act of the legislature and the subsequent confirming vote of the town have put it in a position to legally tax its inhabitants to carry out the provisions of the vote. That act is opposed to no provision of the state or national constitutions. It can only be adjudged invalid on the ground that it is opposed to natural right and justice. *Welch* v. *Wadsworth,* 30 Conn., 149. That it is not so opposed the sense of the community, as evidenced by the bounty votes so generally passed by towns, by the almost unanimous vote of the legislature, and the confirmatory votes of the towns, clearly shows. Is it in opposition to natural right and justice that property, three quarters of which is probably in the hands of persons not liable to a draft, should bear its fair share of the burden of the present exigency ? Those over forty-five years of age have an equal interest in the stability of our institutions. The drafted man pays his share of all taxes, and in

addition, whichever of the legal alternatives he chooses, service, either personal, by substitute, or the commutation. Is it unjust that this extra burden should be assumed by all, and the entire community be permitted to pay what the great majority esteem it a privilege to pay? It is not taxing *A* to put money into the pocket of *B;* it is taxing all to meet the requirements of a peremptory law. Nor is it true, as was contended below, that because a duty is imposed upon one individual, therefore it is illegal to tax another to help pay for the performance of such duty. It is the duty of parents to educate their children by the statute; yet a person having no children pays an annual school tax to help educate the children of parents of abundant means. So also taxes are annually laid to support paupers who have relatives legally bound to support them. The right of the legislature to pass confirmatory and retrospective acts can not be questioned. *Goshen* v. *Stonington,* 4 Conn., 209; *Welch* v. *Wadsworth,* 30 id., 149. The legislature may confirm the doings of towns upon condition that they shall re-pass their former vote, and may legalize a tax laid after such confirmatory vote. This is no delegation of legislative power to the town, but only the condition upon which a legislative act shall be applicable to a given case. The legislature gives to cities the right to lay taxes for improvements, for instance, upon a majority vote of the legal voters. The vote of the citizens does not give the right to tax, but is the means of availing themselves of the right. The arguments against the power of towns to grant bounties under this act may be urged with equal force against the right of the state to exercise the same power.

BUTLER, J. " Towns, like other corporations, can exercise no powers except such as are expressly granted to them, or such as are necessary to enable them to discharge their duties, and carry into effect the objects and purposes of their creation." *Abendroth* v. *Greenwich,* 29 Conn., 363. " They act not by any inherent right of legislation, like the legislation of the tate, but their authority is delegated." Daggett, J., in *Willard* v. *Borough of Killingworth,* 8 Conn., 254. Such is

the law as repeatedly recognized by this court, and it is quite too late to urge for them the possession of any inherent or prescriptive rights or powers, or any rights or powers not expressly or impliedly delegated to them by the legislative power of the state.

When in August, 1863, the town of Woodbury passed the vote complained of, they attempted the exercise of a power which had never been so conferred upon them, and their proceedings were void. But by the act of November 13th, 1863, they were authorized by the legislature to ratify and confirm those proceedings, and they did so ratify them, as the demurrer to the respondents' answer admits. That authority and ratification must dispose of this case if it was competent for the legislature to authorize their confirmation.

The votes complained of appropriated six thousand dollars to be divided among the men who should be drafted to fill the quota of that town, authorized by a law of the United States, and called for by the President, and for the purpose of assisting the citizens so drafted to obtain substitutes, or as a bounty if they personally answered the draft and served; and the votes further provided for raising the money by borrowing. This action involved an ultimate tax upon all the inhabitants of the town, for the purpose of conferring a gratuity upon those who, by the law of the land, owed military service to the United States and were called on to render it, and because to render it was deemed a hardship upon those upon whom the draft had fallen or should fall; and that tax must presumptively fall upon some who were not subjects of military duty under existing laws, or liable to be made such under any reasonable and just law which congress have power to enact. Was it competent for the legislature to authorize the ratification of such action by the town ?

This question seems to be involved in another and higher one, viz., whether it is competent for the state legislature to give gratuities to such of our citizens as are called, under the allegiance they owe to the national government, and independent of the allegiance they owe to the state government, by distinctive and independent national enactments, to render

to that national government distinct and independent military service, and tax the citizens generally therefor. For, if they have the power to do it, they may apportion and impose the duty or confer the power of doing it upon the towns.

It is clear that with such action of the general government the state government, as such, has legitimately nothing to do. In authorizing, under the power to raise armies, a national conscription by the national government, the constitution so far forth ignores the state governments entirely; although it is otherwise in respect to the militia, for in regard to their organization and use, by another and distinct clause of the constitution and the laws of Congress enacted under and by virtue of it, the national government and the state governments act together concurrently or in harmony. It is clear therefore that the state government, as such, is under no obligation to aid the general government in such an exercise of its powers, and if it attempts to aid it is wholly a volunteer. By what principle then can the legislative branch of the state government be justified in taxing the people of the state, or authorizing their taxation by towns, to confer gratuities upon persons drafted by the United States.

Not by force of any specific authority conferred by the state constitution. That instrument does not confer any such power specifically. It provides for a collective body of persons, in whom the legislative power of the state shall vest, and by whom that legislative power shall be exercised, as an elective General Assembly, and confers upon them the whole legislative power as inherent in the people, except impliedly such as had been granted to Congress by the constitution of the United States and such as the General Assembly are expressly restrained from exercising by the bill of rights.

The question in hand therefore comes to this:—1st. Had the people of this state when they adopted the present constitution of the state, the inherent right, as part of the legislative power, to appropriate the money of all, as a gratuity to the few who should be called at any time by the national government into its independent service; and 2nd. If they had such power,

Booth *v.* Town of Woodbury.

have they restrained the General Assembly from exercising it by any of the limitations of the constitution.

It must be conceded that the people, if convened and organized as a whole, and acting upon the fundamental principle that what the majority prescribe shall be law, could be under no restraint except that imposed by the principles of natural justice; and the General Assembly in the exercise of that conferred legislative power, and irrespective of the bill of rights, are restrained by the same principles and no other. The first question, therefore, may be further narrowed to the inquiry, whether it is contrary to natural justice that *A* and *B* and the rest of the inhabitants of the state, should be taxed for gratuities to *C* and *D*, when *C* and *D* are called upon to render military service to the general government. It should be observed that the bounty contemplated in the case put, as in this, differs from the bounty given by the United States, for that is in part payment for the service. It differs also from any bounty given to the militia in case they are turned over and mustered into the service of the United States, for the organization and support of the militia is the concurrent duty of both governments. It differs also from the case cited from Root, (*Hitchcock* v. *Litchfield*, 1 Root, 206,) for there the troops were raised by the state and the state apportioned and imposed the duty upon the towns. It differs also from a case of bounty to volunteers raised by the state and turned over to the service of the United States, for in this instance, although the call was apportioned by the general government, for purposes of equality, among the states, districts and towns, it was apportioned and imposed directly upon the people as individuals, and not upon the states, districts and towns. The case is therefore entirely new, and the question returns, could the people as a whole, if they had retained the whole legislative power, by a major vote, tax *A* and *B* and the rest, to give a gratuity to *C* and *D*, because *C* and *D* were drafted by the United States; and if an infringement of the principles of natural justice, is it such an infringement that it is our duty to hold the law inoperative. Very clearly such a vote would not be such an infringement, for several reasons.

In the first place, if it be conceded that it is not competent for the legislative power to make a gift of the common property, or of a sum of money to be raised by taxation, where no possible public benefit, direct or indirect, can be derived therefrom, such exercise of the legislative power must be of an extraordinary character to justify the interference of the judiciary ; and this is not that case.

Second, if there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy and not of natural justice ; and the determination of the legislature is conclusive. And such is this case. Such gifts to unfortunate classes of society, as the indigent blind, the deaf and dumb, or insane, or grants to particular colleges or schools, or grants of pensions, swords or other mementoes for past services, involving the general good indirectly and in slight degree, are frequently made and never questioned.

Third, the government of the United States was constituted by the people of the state, although acting in concert with the people of other states, and the general good of the people of this state is involved in the maintenance of that general government. In many conceivable ways the action of the town of Woodbury might not only mitigate the burdens imposed upon a class but render the service of that class more efficient to the general government, and therefore it must be presumed that the legislature found that the public good was in fact thereby promoted.

And fourth, it is obviously possible, and therefore to be intended, that the General Assembly found a clear equity to justify their action.

Every citizen is bound to take up arms when necessary in defence of his government, not as a matter of strict law, but as an incident of citizenship ; and the selection of a class only, of a certain age, of whom that service is to be immediately demanded in a particular case, although wise, is arbitrary, not based on any peculiar or special obligation resting upon the class, or on their ability alone to render the service or to render it with less pecuniary or social sacrifice, but on the wants of the

government and the supposed fitness of the class to subserve the purposes of the government with more efficiency than others. But if all owe the service, and it is for the common good, and there is the usual provision that it may be rendered by substitute or commutation, it is not easy to see why men above forty-five years of age if able bodied may not be called upon as well as those of less age. If not as able to endure the hardships of the field, they may answer equally well for garrison duty or as details, and presumptively they are better able to procure substitutes or commute, for they have more generally accumulated property or received it by inheritance. Indeed if substitution and commutation are made elements of the conscription, and they were of the law in question, the *ability* to procure a substitute or commute may well be an element without regard to age, and therefore when all above a certain age are exempt they are favored; and it is clearly equitable and just that they equalize the burden by bounties to those who are drafted and serve or by making provision for the support of their families. On this obvious equity rests the general law making provision for the families of all drafted men and their substitutes.

As therefore, if the people of the state collectively had retained all that portion of their legislative power not delegated to the Congress of the United States, it would have been competent for them to pass votes in reference to all the drafted men of the state like those which the respondent town passed, and as they have delegated their whole remaining legislative power to the General Assembly with certain exceptions contained in the bill of rights, it was competent for the General Assembly to do so, and therefore it was competent for them to delegate that power to territorial districts of the state or towns, and of course to authorize the towns to ratify votes of that character which they had passed without seeking beforehand such delegation of authority, unless the Assembly are restrained from the exercise of that power by some clause in the bill of rights contained in the constitution. And this leads to the second question, viz., whether there is any such prohibition in the bill of rights.

The clause relied upon by the petitioners is that which inhibits the " taking of private property for public use without just compensation." But it is clear that the law in question was not passed in contravention of that clause of the constitution. The votes of the town did not contemplate the taking of any property within the meaning of that clause. They appropriated money as a bounty or gratuity, and authorized the selectmen to borrow it, and the legislature authorized them, by the act of November 13th, 1863, to lay a tax to pay it. If it be conceded that the money must be raised by tax, and that as a necessary consequence appropriating the money was equivalent to laying a tax, still the action of the legislature was not within the clause. Exacting money by taxation and taking private property for public use, are different things. Both, it is true, are in one sense the exercise of a right to take the property of individuals for public use, but there is a broad distinction between them. Taxation exacts money from individuals as their share of a justly imposed and apportioned general public burthen, and the equivalent is presumptively received in the benefits conferred by the government. Property taken for public use from one or more individuals only, by right of eminent domain, is taken not as his or their share of an apportioned public burthen, but as something distinct from and more than his or their share of the public burthens, and therefore the justice and necessity of a constitutional provision for compensation. The clause referred to has no bearing on the case.

The superior court must be advised to overrule the demurrer to the answer and dismiss the bill.

In this opinion the other judges concurred.